The Topeka Flour Mills Co., Inc., demandante y apelada, *v.* Sociedad Industrial "La Constancia, Inc.," demandada y apelante.

No. 4312.—*Sometido:* Abril 10, 1928.   *Resuelto:* Mayo 24, 1929.

*López de Tord & Zayas Pizarro,* abogados de la apelante; *Besosa & Besosa,* abogados de la apelada.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

Versa este pleito sobre cumplimiento de un contrato de compraventa de trescientos sacos de harina de trigo.  La demandante, The Topeka Flour Mills Co., es una corporación debidamente organizada en el estado de Kansas, y la demandada, Sociedad Industrial "La Constancia, Inc.," es otra corporación organizada de acuerdo con las leyes de Puerto Rico, residente en Ponce.

"The Topeka" alega en su demanda que el 12 de agosto de 1920 celebró un contrato con "La Constancia" por virtud del cual le vendió cien sacos de harina "Gold Bell" a $13.80 el saco, cien sacos de harina "La Verdad" a $13.40 el saco y

cien sacos de harina marca "Lusitania" a $13.25 el saco, "entendiéndose que dicha harina sería embarcada del molino de la vendedora inmediatamente, y que los precios serían pagados mediante giros a treinta días vista." Estos hechos fueron aceptados por la demandada en su contestación.

Siguió alegando la demandante que ella había cumplido todas y cada una de las condiciones del mencionado contrato y que "La Constancia" se había negado sin causa alguna justificada a recibir la harina, habiéndose negado de igual modo a pagar el precio convenido ascendente a $4,045.

En su contestación "La Constancia" negó que la demandante hubiera cumplido las condiciones y obligaciones del contrato, afirmando por el contrario que dejó de cumplirlas. Aceptó que se había negado a recibir la harina y a pagar el precio, pero negó que hubiera actuado sin justa causa, afirmando que estuvo justificada en su negativa toda vez que la demandante no cumplió con las condiciones del contrato.

Así quedó trabada la contienda. La demanda se interpuso en 1921. La vista se celebró en 1926. La sentencia apelada se dictó en 1927. La vista del recurso de apelación tuvo lugar en 1928 y no es hasta el 1929 que este tribunal resuelve el caso. Todo ha sido tardío en este asunto.

Aunque como hemos visto la contienda quedó trabada en la forma general de falta de cumplimiento de las condiciones del contrato imputada por la demandante a la demandada y por ésta a aquélla, en el juicio se circunscribió a la tardanza en la entrega de la harina. La Corte de Distrito analizó la prueba y concluyó que no existió tal tardanza y en todo caso que la demandada no se colocó en situación de hacerla valer y dictó sentencia condenándola a pagar a la demandante la suma reclamada con intereses y costas, quedando a su disposición la cantidad de $386.25 depositada como producto líquido de la venta judicial de la harina meses después de iniciado el pleito.

No conforme "La Constancia" apeló para ante esta Corte Suprema señalando en su alegato la comisión de diez y siete

errores la mayor parte de los cuales no son contra la sentencia sino contra la opinión del juez sentenciador y en los cuales se repiten las mismas cuestiones varias veces.

██ Ya hemos dicho que el contrato se celebró el 12 de agosto de 1920 para entrega inmediata del molino. Sobre esto no hay contienda. Tampoco la hay sobre el hecho de que la harina fué entregada por el molino el 10 de septiembre de 1920 y llegó a Ponce el 31 de octubre siguiente.

La fecha de la llegada a Ponce no es importante porque de acuerdo con las condiciones escritas al dorso del contrato que firmó la demandada y a los cuales se le llamó expresamente la atención antes de firmarlo, la demandante no era responsable por las dilaciones debidas a los ferrocarriles y vapores.

La verdadera cuestión a considerar y resolver consistió en si al entregar la harina en su molino el 10 de septiembre de 1920, la demandante cumplió con su contrato de entrega inmediata.

La Corte de Distrito estimó que habiéndose ultimado el contrato en Puerto Rico el 12 de agosto, atendidas las salidas de vapores y correos era razonable concluir que el contrato no llegó a manos de The Topeka hasta fines de agosto o principios de septiembre de 1920, pudiendo estimarse así que la demandante sólo tardó unos diez días en entregar la harina, lo que constituía un tiempo razonable para cumplir con la condición de entrega inmediata consignada en el contrato.

Nada dice el contrato escrito con respecto a si la orden en él contenida debía trasmitirse por carta o por cable, pero la parte demandada demostró por una factura remitídale por la propia demandante que el contrato se había registrado en los libros de la corporación demandante, en Kansas, el 13 de agosto de 1920, y por medio de prueba testifical que es la costumbre comunicar esta clase de contratos por cable.

Si el contrato se registró en Kansas el 13 de agosto, tuvo necesariamente que comunicarse por cable. En su ale-

gato la parte apelada admite que esto es así, pero alega que a tal entrada no puede darse otro alcance que el del mero registro del contrato en general y no en todos sus particulares.

A nuestro juicio la Corte de Distrito erró al fijar como el verdadero punto de partida los últimos días de agosto o los primeros de septiembre. La demandante tenía en Puerto Rico sus agentes debidamente reconocidos, J. Ortega y Co., de San Juan, P. R. El contrato se celebró entre J. M. Rovira, de Ponce, representando a J. Ortega y Co. y "La Constancia" y fué confirmado el 12 de agosto por J. Ortega y Co.. así:

"Como representantes de la Topeka Flour Mills Co. de Topeka, Kansas, tenemos el gusto de confirmar a ustedes el siguiente pedido . . . "

El documento contenía esta cláusula:

"El pedido se embarcará, salvo causa de fuerza mayor o que no dependa de la voluntad de los vendedores, en la siguiente forma: del molino, inmediato."

Desde el día de la confirmación del contrato, 12 de agosto, comenzó a regir la cláusula de entrega inmediata, trasmitida por cable por el agente al principal y recibida por éste el 13 de agosto. Decimos trasmitida por cable porque no es razonable concluir que la comunicación por cable que dió origen a la entrada del pedido en los libros de la demandada, omitiera una condición tan esencial. No fueron, pues, diez días los que tuvo la demandante sino veintiocho para cumplir con la condición de entrega inmediata y sobre ese período de veintiocho días es que debe basarse la interpretación judicial.

En el caso de *G. H. Hammond Co.* v. *Diego Agueros y Co.*, 30 D.P.R. 610, se estudia una cuestión semejante y después de citar la ley y la jurisprudencia se fija el alcance de las palabras "lo más pronto posible" usadas en un contrato, llegándose a la siguiente conclusión:

"En el presente caso en que las partes habían estado negociando durante años y sufrido demoras de 20 días en los embarques de efectos vendidos a la demandada el primer embarque de una orden para entregar *'lo más pronto posible'* se hizo después de 28 días de firmado el contrato. *Se resolvió:* que la demora de 8 días más sobre demoras toleradas en otras ocasiones no es irrazonable, a menos que alguna condición peculiar se acredite por la cual se haga necesario para el comprador tener antes la mercancía."

En el presente caso no hubo negociaciones previas, la que se hizo constituía la primera transacción entre las partes y ya hemos dicho que no estamos considerando la fecha del embarque o la de la llegada de los artículos, sino la de la entrega por el molino de los géneros vendidos.

El término "inmediato" como se consigna en el contrato o "inmediatamente" como se alega en la propia demanda, es más vigoroso y definido que la frase "lo más pronto posible" interpretada en el caso de Hammond, *supra.*

Ruling Case Law, trata extensamente la cuestión, y de él tomamos lo que sigue:

"De igual manera, se ha resuelto que una demora de ocho días no constituye el cumplimiento de un contrato que especifica embarque inmediato.' Por otra parte, se ha resuelto que, bajo las circunstancias existentes, una tardanza de treinta días no implica como cuestión de derecho que se dejara de hacer el embarque 'inmediatamente,' y una conclusión del jurado de que a pesar de tal demora se cumplió el requisito de embarque inmediato, ha sido sostenida." 23 R.C.L. 1371.

La primera conclusión se funda en el caso de *Woods* v. *Miller*, 55 Iowa 168, 39 Am. Rep. 170. De la opinión transcribimos el siguiente párrafo:

"Cuando un contrato ha de ser cumplido dentro de un tiempo razonable, es propio considerar, al determinar lo que constituye tiempo razonable, las circunstancias que rodean su cumplimiento. Goodall v. Streeter, 16 N.H. 97. Pero el contrato en este caso debía ser cumplido inmediatamente. Ahora bien, si el hecho fué que las patatas no habían sido recogidas, quedaba por hacer algo importante antes de que los demandantes pudieran emprender el trabajo de embarcarlas. Se necesitaban ocho días para recoger las patatas. El con-

trato no fué cumplido de acuerdo con sus términos y es imposible que los demandantes recobren a menos que puedan demostrar que se renunciara el cumplimiento estricto del contrato.''

La segunda se basa en el caso de *Claus Shear Company* v. *Lee Hardware House*, 140 N. Car. 552, 6 Ann. Cas. 243. El razonamiento de la corte es como sigue:

''El demandado sostiene que el contrato oral especificaba la entrega de la mercancía *inmediatamente* y que la prueba tendió a demostrar una demora de por lo menos treinta días entre el recibo de la orden y el embarque, lo que según el demandado constituye una demora irrazonable, y que el juez erró al dejar que el jurado determinara la cuestión de 'tiempo razonable.' Ha habido numerosos casos que determinan el significado de los términos 'inmediatamente' y 'sin dilación,' etc., tal como se usan en contratos, y se ha resuelto que esos términos deben ser interpretados liberalmente. Tales términos jamás significan la absoluta exclusión de cualquier intervención de tiempo sino que sólo quieren decir que no mediará un lapso de tiempo irrazonable antes de cumplirse el contrato. 21 Am. and Eng. Encyc. of Law (1st ed.) 535, nota 1. Cuando un convenio exige el pago inmediato de dinero la parte tiene derecho a un tiempo razonable para obtenerlo. Toms v. Wilson, 4 B. & S. 455, 116 E.C.L. 455.

'' *      *      *      *      *      *      *

''Empero, el tiempo puede ser tan corto o tan largo que la corte lo declarara razonable o irrazonable como cuestión de ley. Si la cuestión de tiempo razonable es una de hecho ó de ley debe, 'a causa de la naturaleza misma de las cosas,' depender de las circunstancias de cada caso en particular, toda vez que los asuntos de negocios son tan calidoscópicos en su naturaleza que rara vez, si ello puede suceder, dos transacciones son exactamente iguales.

''Si, por los hechos admitidos, la corte puede llegar a la conclusión respecto a si el tiempo es razonable o irrazonable aplicando un principio legal o una regla de derecho, entonces la cuestión es una de derecho. Pero si pueden derivarse inferencias distintas, o las circunstancias son numerosas y complicadas, y son tales que no puede aplicárseles una regla legal definida, entonces el asunto debe serle sometido al jurado. Sólo cuando no hay controversia respecto a los hechos y no pueden derivarse razonablemente distintas inferencias de ellos es que la cuestión puede llegar a ser una de derecho. Colt v. Owens, 90 N. Y. 368; Hedges v. Hudson River R. Co., 49 N. Y. 223; Pinney v. First Div. St. Paul, etc., R. Co., 19 Minn. 251.

''Esta cuestión surge frecuentemente con motivo de contratos de

venta y entrega de mercaderías cuando no se fija una fecha para la entrega. Tal fué el caso en Ellis v. Thompson, *supra*. En el caso de Cocker v. Franklin Hemp., etc. Mfg. Co., 3 Sumn. (U. S.) 532, el Juez de Circuito Sr. Story sometió la cuestión de tiempo razonable al jurado y al hacerlo así el erudito magistrado se refirió con aprobación a la regla sentada por Baron Alderson en Ellis v. Thompson. Después de manifestar que lo que constituía tiempo razonable para la entrega de carbón en Londres era una cuestión a ser resuelta por el jurado a falta de una fecha específica en el contrato, aquel eminente juez inglés dice: 'Paréceme que el modo correcto de determinar lo que es tiempo razonable en un caso como éste es colocar a la corte y al jurado en la misma situación en que se hallaban las partes contratantes al tiempo de hacer el contrato, esto es, trayendo al jurado todas aquellas circunstancias que ambas partes conocían al tiempo que se hizo el contrato y bajo las cuales se efectuó el convenio.' ''

Aunque se establezca, pues, la condición de entrega inmediata, debe entenderse que el vendedor tiene un término razonable para la entrega, pero la razonable extensión en ese caso no puede ser la misma que cuando no se establece la condición. Si un vendedor no tiene listos para su entrega los artículos que ofrece en venta, no debe comprometerse a una entrega inmediata.

La parte demandada trató de demostrar por medio de ''The Rules Regulating Flour Trade among members of the New York Produce Exchange'' y de prueba de testigos, lo que en las prácticas del comercio en el continente y en la isla se entiende por entrega inmediata, pero la parte demandante se opuso y la Corte sostuvo su oposición. Sin embargo, después de ocurrido esto, declarando el testigo Claudino Santiago, comerciante comisionista, aparece del récord lo que sigue:

''P.—¿Los pedidos usted los hace para revenderlos?—R.—No. Son de acuerdo con ofertas que les tomamos a las casas comerciales.—P.—¿No son harinas para su consumo?—R.—No, señor. Son harinas para vender a las casas comerciales y panaderías.—P.—¿Se dirige el cable habiendo una estipulación o una conformidad en relación a la harina, el precio, la cantidad, fecha de embarque, etc.?—R.—Sí, se-

ñor.—P.—¿Y habiendo la conformidad de la casa principal, qué se hace—R.—Se hace el contrato.—P.—¿Y se embarca en la fecha dicha?—R.—En la fecha dicha.—P.—¿Y cuando no se estipulaba la fecha del embarque, cuándo debían venir esas harinas?—R.—Si no se relaciona, si no se estipula dentro del contrato la fecha del embarque? No vendemos en esas condiciones; nadie compra así; los comerciantes son muy esquivos; no compran sino para embarcar en fechas determinadas; es el comprador quien las fija; pronto embarque o embarque inmediato. Ellos no aceptan en otras condiciones, porque sería entonces para embarcar cuando el molino quisiera. Existía otra cierta forma de embarque: lo más pronto posible, y eso era para cuando le diera la gana a cualquier molino embarcar.—P.—¿Y esas frases 'pronto embarque' y 'embarque inmediato,' qué significan?— R.—Embarque inmediato son siete días y no se cuenta el día en que se acepta, el día en que se acepta la oferta; y pronto embarque son catorce días, no contándose el día en que se acepta el negocio.— Demandante: P.—¿Usted dijo que los embarques se hacían de siete a diez días para embarque inmediato, y veinte días para pronto embarque?—R.—No he mencionado nada de diez días; yo he mencionado siete días y catorce días bien claro.—P.—Cuando usted declaró según la notita de la libreta que usted nos sacó ahí . . . —R.—Eso no es una libreta; ésas son facturas comerciales, señor letrado.— P.—Yo no sé lo que son. Yo no las veo bien.—R.—Yo puedo presentárselas para que las vea.—P.—Cuando usted declaró sobre el 'pronto embarque' e 'inmediato embarque,' sobre las frases éstas, relacionó usted algunas órdenes recibidas. Una de agosto siete del veinte y embarcada el trece y recibida en Ponce un mes después, y etc. Esas órdenes cómo fueron enviadas?—R.—Por ferrocarril.—P. —¿Cómo enviaron las ofertas?—R.—Las ofertas, por cable.—P.—¿Usted no ha enviado órdenes por carta?—R.—Por carta, nunca; todo se tramita por cable.''

Veamos ahora, aplicando la regla del Baron Alderson a que se refiere el Juez Story en el caso de Claus Shear Company, *supra,* cuáles fueron las circunstancias en que se encontraban las partes contratantes al tiempo de la celebración del contrato en este caso.

Con respecto a lo que ocurriera en Topeka, Kansas, nada nos dicen los autos con excepción de que el contrato se registró en los libros de la corporación demandante en ·13 de

agosto 1920 y que el 13 de septiembre siguiente dicha corporación dirigió a la demandada una carta que lee así:

"Dear Sirs: We are pleased to hand you herewith 1 copy invoice and 2 copies export bill of lading covering 300 bags of flour shipped Sept. 11th.—Trusting that this shipment reaches you promptly and in good condition and awaiting your further favors, we remain, Very truly yours, The Topeka Flour Mills Co., Per (Sgd) R. E. Smith, Traffic Manager."

Del conocimiento de embarque acompañado aparece que el molino entregó la harina el 10 de septiembre. A este respecto el testigo Joaquín Armstrong y Mayoral se expresó así:

"P.—¿Podría usted informar, con vista de este conocimiento de embarque, a la Corte en qué fecha fué entregada esta harina por el molino, si está indicada en ese bill of lading?—R.—Fué entregada el día diez de septiembre del año mil novecientos veinte.—P.—¿Dónde lo dice?—R.—Aquí: this 10th day of September, 1920."

La parte demandante no presentó prueba alguna tendente a explicar por qué el molino tardó veintiocho días en entregar la harina. Sucedió que al comenzar la vista en la Corte de Distrito dicha parte demandante pidió la suspensión por no haberle sido posible preparar su prueba y la Corte no accedió. Hacía cinco años que el caso estaba pendiente y no obstante el cambio de abogado que parece que fué a última hora no se explica que no se tuviera preparada la prueba teniendo como tenía la demandante sus agentes en Puerto Rico.

La prueba de la parte demandada es por el contrario completa y revela en todos sus detalles que la harina fué comprada para satisfacer las necesidades inmediatas de su fábrica de fideos y que no habiendo llegado a tiempo hubo necesidad de comprarla en la isla especificándose a quiénes se compró, cantidades y precios. Demuestra también dicha prueba que la demandada pagó por cada saco de harina cuarenta centavos más de lo que había ofrecido, y aunque no consta del contrato mismo que esos cuarenta centavos se

pagaran a fin de que se consignara la condición de **entrega inmediata,** se ha explicado que en las negociaciones preliminares fué esa la consideración que tuvo la demandada para ello.

Bajo todas esas circunstancias creemos que se impone la siguiente conclusión: la demandante no cumplió con la condición de entrega inmediata esencial en el contrato, y en tal virtud al resolver lo contrario erró la Corte sentenciadora.

Parece conveniente recordar que la Corte sentenciadora para considerar razonable el término en que se verificó la entrega, tuvo en mente uno de diez días y no uno de veintiocho como hemos considerado nosotros que transcurrió.

■ Resuelto este punto procederemos a considerar el siguiente o sea el de si la parte demandada se colocó en condiciones de hacer valer su derecho o debe entenderse que lo renunció por no haberlo ejercitado a su debido tiempo.

Bastaría quizá citar la jurisprudencia establecida en el caso de *McFaddin Rice Milling Co.* v. *Maldonado,* 31 D.P.R. 472, para concluir que atendidos los hechos expuestos la demandada estuvo justificada en negarse a recibir la harina cuando llegó a Ponce el 31 de octubre 1920, **pero los autos muestran algo más** que revela que la demandada siguió en éste la práctica más conforme a la ley, la moral y las mejores costumbres del comercio.

Declarando a repreguntas de la demandante el testigo Joaquín Armstrong y Mayoral, Presidente de la corporación demandada, se expresó así:

"P.—¿Si tal era la condición y la necesidad de usted, o de la demandada, por qué trató usted de cancelar ese pedido?—R.—Porque no nos llegó a tiempo; no fué embarcado dentro de las condiciones convenidas de embarque inmediato; hubo incumplimiento de entrega por parte de la compañía vendedora.—P.—¿No es cierto que usted o La Industrial trató de anular dicho pedido, de cancelarlo, antes de su llegada?—R.—Lo cancelamos para la fecha en que la harina debía estar en Ponce porque la harina no estaba aquí; en esa época no había llegado.—P.—¿En qué fecha debía llegar de acuerdo con su criterio?—R.—Pues, del diez al veinte de septiembre de ese año, del

veinte.—P.—¿De manera que ustedes creían que esa harina ha debido llegar a Ponce alrededor del diez al veinte de septiembre?—R.—Días más o días menos; días más o menos; yo no puedo decir; tardaría días más o menos.—¿Si eso es así, por qué ustedes—la demandada—trataron de cancelar dicho contrato de compraventa porque la harina no había sido despachada el día diez de septiembre?—despachada en el molino.—R.—Yo no recuerdo haber dicho eso; habría que refrescar mi memoria, pero. . .—P.—¿Usted no conoce esta carta escrita por la demandada de fecha veinte de diciembre de mil novecientos veinte? R.—Veremos a ver. Fué dictada precisamente por mí; por orden mía fué escrita.—P.—¿Usted la dictó?—R.—Sí, señor. . .—P.—¿De manera, señor Armstrong, que de acuerdo con esa carta de la misma demandada, ustedes querían anular o cancelar ese pedido porque no había sido embarcado el día diez de septiembre. ¿Es cierto o no es cierto?—R.—Todo lo contrario. Lo cancelamos porque fué embarcado el día diez de septiembre, fuera de tiempo; es lo que dice esta carta.—P.—¿Cuándo fué que la demandada solicitó la cancelación de ese pedido?—¿En qué fecha?—R.—Pues, en la fecha en que se les compró a los señores Bonnin & Compañía, los ciento noventa y nueve sacos de harina, allá hacia el veinticinco de septiembre del año veinte.—P.—¿De manera que con fecha veinticinco de septiembre usted trató de cancelar dicho pedido?—R.—Tratamos no; lo cancelamos.—P.—¿Usted que tiene tanto conocimiento de materia legal, explique a la corte lo que usted quiere decir por cancelarlo.—R.—Pues, que hacia esa fecha nosotros notificamos al representante del molino en Ponce de que no habiendo la Topeka embarcado la harina dentro de lo convenido, o sea, embarque inmediato, que nosotros dejábamos de cuenta de la Topeka la harina. En aquella fecha nadie, ni nosotros ni los representantes del molino en Ponce, tenía noticias de que la harina se hubiera embarcado.''

Y declarando el Sr. J. M. Rovira, representante en Ponce de J. Ortega y Co., de San Juan, Agentes en·Puerto Rico de la corporación demandante, y que fué el que obtuvo el contrato origen de este pleito, dijo.

''P.—¿Le vendió usted alguna harina a La Constancia?—R.—Sí, señor.—P.—¿Recuerda usted la fecha?—R.—Pues, por allá en el año veinte; en el mes de agosto de mil novecientos veinte.—P.—¿Recuerda usted el mes?—R.—En el mil novecientos veinte, mes de agosto. —P.—¿Cuántos sacos le vendió?—R.—Trescientos sacos de harina; tres clases de harina.—P.—¿Usted sabe si esta harina llegó a Ponce

a tiempo?—R.—No llegó a tiempo.—P.—¿Le hicieron los comprado-res algunas manifestaciones teniendo presente que no había llegado la harina a tiempo?—R.—Sí, señor.—P.—¿Qué manifestaciones le hi-cieron?—R.—Que ellos estaban muy necesitados de la harina, que no llegaba, y que era la última quincena de septiembre, que era la época en que tenía que estar aquí la harina; entonces me dijeron que si no había llegado la harina, ellos se verían imposibilitados de aceptarla. —P.—¿La llegaron a cancelar?—R.—Sí, señor. Fuimos notificados. —P.—¿Qué hizo usted?—Demandante.—Me opongo a todas esas preguntas y respuestas. Pido la eliminación de todas esas preguntas y respuestas, por ser materia completamente inmaterial e impertinente debido a que no consta en ninguna parte la contestación de la de-mandada de que dicho pedido hubiera sido cancelado. No es materia de defensa; no es materia de defensa especial presentada por la demandada, y por tanto, no se le ha dado aviso a la parte deman-dante sobre dicha materia para la necesaria presentación de prueba de rebuttal y por ser materia que no está en issue.—Juez.—La Corte niega la eliminación.—Demandante.—Tomo excepción.—Demandado. —P.—¿Usted hizo saber a los agentes que La Constancia había can-celado ese contrato?—R.—Sí, señor.—Demandante.—Me opongo a la pregunta.—Juez.—La Corte admite la pregunta.—Demandante.—To-mamos excepción.—Demandado.—P.—¿En qué forma? ¿Quiénes eran los agentes de la Topeka Flour Mills Company?—R.—José Ortega & Compañía, de San Juan.—P.—Es una casa de San Juan. ¿Usted qué era en Ponce?—R.—Agente de José Ortega & Compañía.—P.— ¿O sea sub-agente del molino?—R.—Sí, señor.—P.—¿Usted lo comu-nicó a los agentes?—R.—Sí, señor.—Demandante.—Me opongo a la pregunta y pido que se elimine todo lo declarado sobre la cancelación de dicho pedido, porque ahora ha declarado el testigo sobre que él no representaba a la Topeka Flour Mills Company sino que repre-sentaba a la firma Ortega & Compañía de San Juan, que era la casa que representaba a la Topeka, y, por tanto, las declaraciones de este testigo son completamente inmateriales e impertinentes, y, ade-más, no son materias de negativa, o de contestación, o de defensa, no están en issue, y dicha prueba no debe constar en estos autos.— Juez.—La Corte niega la eliminación solicitada. El testigo ha mani-festado que actuaba en Ponce como agente de la casa de Ortega & Co., que eran los agentes de la Topeka allá en San Juan. Puede continuar.''

La demandada se entendió en cuanto a la cancelación con la misma persona con quien se entendió en cuanto a la celebración del contrato.

La sentencia apelada *debe revocarse y en su lugar dictarse otra declarando la demanda sin lugar* y dejando la suma de $386.25 depositada como producto de la venta judicial de la harina a disposición de la demandante, *todo sin especial condenación de costas.*

El Juez Asociado Sr. Wolf está conforme con la sentencia.

OPINIÓN CONCURRENTE EMITIDA POR EL JUEZ ASOCIADO SR. WOLF.

Estoy conforme con el resultado, porque no creo que la mercancía fuera entregada "inmediatamente," según rezaba el contrato. Si bien una palabra como "inmediatamente" concede al vendedor cierto tiempo razonable para cumplir con el contrato, bajo los hechos de este caso el período fué demasiado largo, según se demuestra en la opinión de la mayoría. No estoy de acuerdo con que cuando se efectúa una venta haya diferencia alguna entre el efecto legal de las palabras "tan pronto como sea posible" e "inmediatamente." Podría ser que haya un poco de más fuerza en la palabra "inmediatamente" que en la mayoría de términos similares, pero no podría hacerse distinción entre el término que debe concedérsele al vendedor en cada caso. Creo que todo esto se desprende de los casos citados en la opinión de la mayoría, y especialmente en el de *The G. H. Hammond Co.* v. *D. Agüeros & Co., Ltd., supra.* Se hizo una cita de 23 R.C.L. 1371. El párrafo es el número 194, y empieza así: "Prontamente—Inmediatamente—En seguida, o términos similares." La frase "tan pronto como sea posible" fué también considerada como que estaba sujeta a la misma interpretación de la palabra "inmediatamente."